1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

11 WILLIAM HEARN,

Plaintiff,

12

v.

13

14 DR. JANANGIR SADEGHI,

Defendant.

15

16

Case No. 17-02038 BLF (PR)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

(Docket No. 19)

17

18       Plaintiff, a California state prisoner, filed a *pro se* civil rights complaint under 42

19 U.S.C. § 1983 against Dr. Janangir Sadeghi at San Quentin State Prison ("SQSP").

20 Finding the complaint stated a cognizable Eighth Amendment claim for deliberate

21 indifference to serious medical needs, the Court issued an order of service and directed

22 Defendant to file a motion for summary judgment or other dispositive motion. (Docket

23 No. 4.) Defendant Sadeghi filed a motion for summary judgment on the grounds that

24 Plaintiff failed to exhaust administrative remedies, there is no genuine dispute of material

25 facts that Defendant acted with deliberate indifference, and qualified immunity. (Docket

26 No. 19, hereafter "Mot."[1]) Plaintiff filed opposition, (Docket No. 20), and Defendant filed

27

─────────────────────────

28 [1] In support of the motion, Defendant provides the declarations of Defendant Sadeghi and
Dr. Daniel J. Coden. (Docket Nos. 19-4, 19-6.) Defendant also provides authenticated

a reply, (Docket No. 21).  For the reasons stated below, Defendant's motion for summary

judgment is **GRANTED**.

## DISCUSSION

I.    Background

   A.    Statement of Facts[2]

   Defendant Sadeghi is a licensed physician and ophthalmologist in California.

(Sadeghi Decl. ¶ 1.)  Defendant first examined Plaintiff on January 16, 2014, for

complaints of blurry vision in both eyes.  (*Id.* ¶ 3.)  Defendant diagnosed cataracts

(clouding of the lens) in both eyes.  (*Id.*; SQSP 2660.)  Defendant determined the

appropriate plan of treatment was to perform a type of cataract surgery known as

phacoemulsification on Plaintiff's right eye, with the possibility of the same operation in

the left eye depending on the results of the first surgery.  (*Id.*)  According to Defendant,

there was no indication that Plaintiff suffered from glaucoma[3] in January 2014, although

he subsequently developed temporary inflammatory glaucoma, as described below.  (*Id.*)

   According to Plaintiff, he complained during March and April 2014, of having

severe headaches throughout the day and blurry vision.  (Hearn Decl. ¶ 1, Opp. at 117.)  A

nurse summoned Defendant Sadeghi who prescribed eye drops for use throughout the day

"to relieve the pressure out of [his] right eye."  (*Id.*)

   On May 7, 2014, Defendant performed cataract surgery in Plaintiff's right eye at

Marin General Hospital.  (Sadeghi Decl. ¶ 4; SQSP 2877-2878; Hearn Decl. ¶ 2.)  During

---

copies of Plaintiff's medical records from SQSP, (Docket No. 19-2 (Ex. A) (hereafter
referred to as "SQSP" with original pagination), and the University of California San
Francisco Medical Center ("UCSF"), (Docket No. 19-3 (Ex. B) hereafter referred to as
"UCSF" with original pagination).

[2] The following facts are undisputed unless otherwise indicated.

[3] Glaucoma is a group of related diseases that affect the eye's optic nerve.  (Coden Decl. ¶
7.)

the surgery, Defendant removed the cataract, performed an anterior vitrectomy and inserted an intraocular lens ("IOL") in Plaintiff's right eye. (*Id.*) During surgery, a tear occurred in the posterior capsule of Plaintiff's right lens, which is a known risk of surgery. (*Id.*) Defendant treated the torn capsule by removing cortical material and performing a vitrectomy, which is a procedure to remove vitreous material from the eyeball. (*Id.*) He then inserted the prosthetic lens into the sulcus – as opposed to the capsular bag – because the capsular bag might not provide adequate support after the tear. (*Id.*)

During the post-surgical follow-up examination on the next day, May 8, 2014, Defendant noted that Plaintiff's right eye exhibited corneal striations (folds) and pieces of cortex in the pupillary area. (Sadeghi Decl. ¶ 5; SQSP 2642.) According to Plaintiff, he had severe headaches throughout the day and blurred vision in his right eye, which Defendant explained was due to the pressure in his right eye; Defendant prescribed a different kind of medication. (Hearn Decl. ¶ 3.) Defendant scheduled a follow-up examination in a week to evaluate Plaintiff's condition. (Sadeghi Decl. ¶ 5.)

According to Plaintiff, on May 12, 2014, he "passed out from constant severe pain and suffering," which triggered a medical alarm and Plaintiff being escorted to the infirmary where he was seen by Defendant. (Hearn Decl. ¶ 4.) Plaintiff states that Defendant "released the pressure from Plaintiff's right eye, [and] prescribed a different medication." (*Id.*)

On May 15, 2014, Defendant noted that the cortical material in Plaintiff's right eye had not dissolved and was causing high intraocular pressure ("IOP"), so aspiration of the material was necessary. (Sadeghi Decl. ¶ 6; SQSP 2640.) According to Plaintiff, Defendant informed him that "'he had made a mistake and left a piece of cataract in his right eye.'" (Hearn Decl. ¶ 5.)

On May 21, 2014, at Marin General Hospital, Defendant performed an operation to aspirate the remaining cortical material in Plaintiff's right eye. (Sadeghi Decl. ¶ 7; SQSP 2876; Hearn Decl. ¶ 6.) Defendant removed some of the cortical material with a cannula,

but some material was more difficult and required aspiration.  (*Id.*)  Plaintiff tolerated the procedure well and left the operation room in satisfactory condition.  (*Id.*)

The next day on May 22, 2014, Defendant examined Plaintiff and noted that he was having difficulties with the vision in his right eye due to corneal striation and a small pupil. (Sadeghi Decl. ¶ 8; SQSP 2636.)  Defendant diagnosed corneal edema, which is excess swelling at the cornea of the eye and treated it with medication administered by eye drops. (*Id.*; Hearn Decl. ¶ 7.)  There was no apparent cortical material remaining in the eye. (Sadeghi Decl. ¶ 8.)  Defendant scheduled a follow-up for one week, with instructions to be notified if Plaintiff was in pain or there was any change in vision.  (*Id.*)

According to Plaintiff, he was summoned by Defendant to his office on May 29, 2014, for an examination.  (Hearn Decl. ¶ 8.)  Defendant informed him that his cornea was swelling and that after it "goes down," the vision in his right eye would become clear. (*Id.*)

On June 5, 2014, Defendant examined Plaintiff who reported pain and blurry vision in his right eye.  (Sadeghi Decl. ¶ 9; SQSP 2635.)  Defendant noted that Plaintiff had two small pieces of cortical material in the anterior chamber of his right eye, that the IOL was in good position and the retina was attached, but that Plaintiff had developed inflammatory glaucoma.  (*Id.*)  Defendant prescribed five different types of eye drops to treat Plaintiff's condition.  (*Id.*)  According to Plaintiff, Defendant informed him during this visit that his cornea was "scarred up from the surgery" and that he would refer Plaintiff to a cornea specialist at UCSF Medical Center.  (Hearn Decl. ¶ 9.)

The next day on June 6, 2014, Defendant again examined Plaintiff and documented that he had developed inflammatory glaucoma due to the remaining cortical material in his right eye, and that the five types of eye drops had been prescribed.  (Sadeghi Decl. ¶ 10; SQSP 2633.)

On June 13, 2014, Defendant examined Plaintiff and documented that two small pieces of cortical material remained.  (Sadeghi Decl. ¶ 11; SQSP 2632.)  The IOL was in a

4

good position, but the intraocular pressure was high with corneal edema and Plaintiff had corneal inflammation with superficial punctate keratitis ("SPK"), which is epithelial cell damage on the surface of the cornea. (*Id.*) Defendant prescribed four types of eye drops to treat the condition, including steroidal eye drops. (*Id.*)

On July 3, 2014, Defendant examined Plaintiff and noted that a small piece of cortical material was being absorbed and that the SPK and IOP were stable. (Sadeghi Decl. ¶ 12; SQSP 2631.) Defendant prescribed four types of eye drops. (*Id.*)

On July 17, 2014, Defendant again examined Plaintiff, noting corneal striation, extensive SPK and corneal inflammation. (Sadeghi Decl. ¶ 13; SQSP 2630). Defendant continued to prescribe eye drops to treat Plaintiff's condition. (*Id.*)

On July 24, 2014, Defendant examined Plaintiff and documented that his right eye had extensive SPK on his cornea with a corneal epithelial defect and corneal striation. (Sadeghi Decl. ¶ 14; SQSP 2629.) Defendant further noted that Plaintiff would be examined by an optometrist, Linda H. Hur, O.D., regarding possible use of a bandage contact lens. (*Id.*)

On August 7, 2014, Defendant examined Plaintiff and noted that his right eye IOL was in good position, the SPK corneal inflammation had improved. (Sadeghi Decl. ¶ 15; SQSP 2623.)

On August 21, 2014, Defendant examined Plaintiff for complaints of unclear vision and headaches with reading. (Sadeghi Decl. ¶ 16; SQSP 2622.) Defendant noted the first indication of a dislocated IOL, as well as corneal striation. (*Id.*)

After another examination on August 28, 2014, Defendant referred Plaintiff to a corneal specialist at UCSF for evaluation of corneal edema and a possible dislocated IOL. (Sadeghi Decl. ¶ 17; SQSP 2620-2621.)

On September 18, 2014, Defendant examined Plaintiff and diagnosed him with bullous keratopathy (formation of fluid-filled blisters on surface of cornea), and noted that he was waiting to see the UCSF corneal specialist. (Sadeghi Decl. ¶ 18; SQSP 2617.)

On October 17, 2014, Defendant examined Plaintiff who reported difficulties reading. (Sadeghi Decl. ¶ 19; SQSP 2614.)  Defendant's diagnosis was corneal edema in the right eye and a cataract on the left eye, noting that Plaintiff was still waiting to see the UCSF corneal specialist. (*Id.*)

According to Plaintiff, he was examined by Dr. Jennifer Ruth Rose-Nussbaumer at UCSF Medical Center on December 15, 2014. (Hearn Decl. ¶ 10.)  When Dr. Rose-Nussbaumer asked Plaintiff how the trauma happened, Plaintiff explained that Defendant Sadeghi had performed cataract surgery and a lens implant. (*Id.*)  Dr. Rose-Nussbaumer initially could not find the lens implant, and eventually found it at the bottom of Plaintiff's eye with the assistance of four other physicians. (*Id.*)

On January 15, 2015, Defendant saw Plaintiff and noted that he was examined a month earlier by a UCSF corneal specialist, who suggested a retina specialist perform a vitrectomy and remove and replace the dislocated IOL. (Sadeghi Decl. ¶ 20; SQSP 2608.)

On February 12, 2015, Defendant saw Plaintiff and noted that he had seen a retina specialist at UCSF on February 11, 2015, and had been advised that surgery would occur to repair his dislocated IOL. (Sadeghi Decl. ¶ 21; SQSP 2606.)

Plaintiff underwent surgery on March 24, 2015, at USCF to replace the dislocated IOL in his right eye. (Coden Decl. ¶ 27; UCSF 7-9.)

Defendant's next examination of Plaintiff occurred on June 26, 2015, when he noted that Plaintiff had undergone surgery to repair the dislocated IOL in his right eye and that he was waiting for a partial corneal transplant recommended by UCSF physicians. (Sadeghi Decl. ¶ 22; SQSP 2596.)  Defendant noted that Plaintiff's corneal edema had improved and his IOL was stable. (*Id.*)

On July 24, 2015, Defendant noted that Plaintiff was suffering from SPK (corneal inflammation) with edema in his right eye and planned to refer him to Dr. Rose-Nussbaumer at UCSF to evaluate his cornea. (Sadeghi Decl. ¶ 23; SQSP 2592.)

On August 20, 2015, Plaintiff underwent a second surgery at UCSF – Mt. Zion

Medical Center for a partial cornea transplant, a procedure known as DSAEK.  (Sadeghi Decl. ¶ 24; UCSF 69-73.)

On December 3, 2015, Defendant examined Plaintiff and noted that he was using four different eye drops.  (Sadeghi Decl. ¶ 25; SQSP 2538.)  Plaintiff's IOP had been as high as 42 and had decreased to 32, which was still too high.  (*Id.*)  Defendant's plan was to refer him to Dr. Rose-Nussbaumer for further evaluation.  (*Id.*)

On December 14, 2015, an urgent Physician Request for Service was submitted for Plaintiff to undergo glaucoma surgery to relieve the high IOP in his right eye.  (Coden Decl. ¶ 32; SQSP 2579.)  On December 22, 2015, Plaintiff underwent surgery at UCSF.  (*Id.*; UCSF 152-153.)

On January 7, 2016, Defendant examined Plaintiff and noted that he had undergone glaucoma surgery two weeks earlier to release the high IOP.  (Sadeghi Decl. ¶ 26; SQSP 2577.)  Defendant noted that there was no indication of rejection, the IOL was in good position, and the IOP had decreased.  (*Id.*)

On January 14, 2016, Defendant removed Plaintiff's sutures and noted that the right eye had improved and the IOP was low.  (Sadeghi Decl. ¶ 27; SQSP 2576.)

On January 28, 2016, Defendant examined Plaintiff and noted that the right eye IOP was low, so the plan was to schedule a follow-up examination in eight weeks.  (Sadeghi Decl. ¶ 28; SQSP 2570.)

Defendant's final examination of Plaintiff was on March 17, 2016, with nothing remarkable noted; a follow-up was scheduled for six weeks.  (Sadeghi Decl. ¶ 29; SQSP 2567.)

**B.    Plaintiff's Claims**

Plaintiff claims that the day after he underwent cataract surgery and a lens implant in his right eye on May 7, 2014, by Defendant Sadeghi, he began suffering from severe headaches and blurred vision in his right eye.  (Compl. at 3.)  After seeing Plaintiff several times for continued problems throughout May 2014, Defendant finally referred him to a

cornea specialist at UCSF Medical Center.  (*Id.* at 4.)  Plaintiff claims that during the appeal process, it was determined by Defendant Sadeghi that Plaintiff's illness was for "acute glaucoma" and not for cataracts, and therefore the lens implant was not appropriate and was the cause of Plaintiff's pain, suffering, and the loss of his vision.  (*Id.* at 5.) Plaintiff claims that Defendant's actions amount to deliberate indifference to serious medical needs and seeks damages.  (*Id.*)  The Court found Plaintiff stated a cognizable claim under the Eighth Amendment.  (Docket No. 4 at 2.)

## II.   **Summary Judgment**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp.*, 477 U.S. at 323.  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may

be granted. *See Liberty Lobby*, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citations omitted). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id.* at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. *See T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.; see, e.g., Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028-29 (9th Cir. 2001).

### A. Exhaustion

The Prison Litigation Reform Act of 1995 ("PLRA") amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and no longer left to the discretion of the district court. *Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)). "Prisoners must now exhaust all 'available' remedies, not just those that meet federal standards." *Id.* Even when the relief sought

cannot be granted by the administrative process, i.e., monetary damages, a prisoner must still exhaust administrative remedies. *Id*. at 85-86 (citing *Booth*, 532 U.S. at 734). The PLRA's exhaustion requirement requires "proper exhaustion" of available administrative remedies. *Id*. at 93. An action must be dismissed unless the prisoner exhausted his available administrative remedies <u>before</u> he or she filed suit, even if the prisoner fully exhausts while the suit is pending. *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002); *see Vaden v. Summerhill*, 449 F.3d 1047, 1051 (9th Cir. 2006) (where administrative remedies are not exhausted before the prisoner sends his complaint to the court it will be dismissed even if exhaustion is completed by the time the complaint is actually filed).

The California Department of Corrections and Rehabilitation ("CDCR") provides its inmates and parolees the right to appeal administratively "any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare." Cal. Code Regs. tit. 15, § 3084.1(a). It also provides its inmates the right to file administrative appeals alleging misconduct by correctional officers. *See id*. § 3084.1(e). Under the current regulations, in order to exhaust available administrative remedies within this system, a prisoner must submit his complaint on CDCR Form 602 (referred to as a "602") and proceed through three levels of appeal: (1) first formal level appeal filed with one of the institution's appeal coordinators, (2) second formal level appeal filed with the institution head or designee, and (3) third formal level appeal filed with the CDCR director or designee. *Id*. § 3084.7.

Compliance with prison grievance procedures is all that is required by the PLRA to "properly exhaust." *Jones v. Bock*, 549 U.S. 199, 217-18 (2007). The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. *Id*. at 218. In California, the regulation requires the prisoner "to lodge his administrative complaint on CDC form 602 and 'to

10

describe the problem and action requested.'" *Morton v. Hall*, 599 F.3d 942, 946 (9th Cir. 2010) (quoting Cal. Code Regs. tit. 15 § 3084.2(a)); *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (same). California regulations also require that the appeal name "all staff member(s) involved" and "describe their involvement in the issue." Cal. Code Regs. tit. 15, § 3084.2(a)(3).

Nonexhaustion under § 1997e(a) is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 211 (2007). Defendants have the burden of raising and proving the absence of exhaustion, and inmates are not required to specifically plead or demonstrate exhaustion in their complaints. *Jones*, 549 U.S. at 215-17. In the rare event that a failure to exhaust is clear on the face of the complaint, a defendant may move for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). Otherwise, defendants must produce evidence proving failure to exhaust in a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *Id*. If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. *Id*. at 1166. But if material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts in a preliminary proceeding. *Id*.

The defendant's burden is to prove that there was an available administrative remedy and that the prisoner did not exhaust that available administrative remedy. *Id*. at 1172; *see id*. at 1176 (reversing district court's grant of summary judgment to defendants on issue of exhaustion because defendants did not carry their initial burden of proving their affirmative defense that there was an available administrative remedy that prisoner plaintiff failed to exhaust); *see also Brown v. Valoff*, 422 F.3d 926, 936-37 (9th Cir. 2005) (as there can be no absence of exhaustion unless some relief remains available, movant claiming lack of exhaustion must demonstrate that pertinent relief remained available, whether at unexhausted levels or through awaiting results of relief already granted as result of that process). Once the defendant has carried that burden, the prisoner has the burden of

11

production. *Albino*, 747 F.3d at 1172. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him. *Id*. But as required by *Jones*, the ultimate burden of proof remains with the defendant. *Id*.

Defendant argues that Plaintiff failed to exhaust his administrative remedies with respect to the claim against him. (Mot. at 9.) According to the CDCR records attached to the complaint, Plaintiff filed a Patient-Inmate Health Care Appeal on September 20, 2014, appeal No. SQ-HC-14039581. (Compl. at 94-95.) In this appeal, Plaintiff explained that he had surgery on his right eye "that became infected from the Doctor leaving some of the cortical material" in the eye, so he was suffering from migraine headaches. (*Id.*) He requested the following relief:

> That a different Doctor is appointment/assigned [*sic*] for a second opinion regarding the damage, pain and suffering this writer is experiencing in order to determine the extent of Appellant's continued pain and suffering after four months.

(*Id.* at 94.)

The first level of review decision dated October 3, 2014, indicates that Plaintiff's appeal was granted in part in that he was referred to a corneal specialist. (*Id.* at 96-97.) Unsatisfied with the first level response, Plaintiff pursued the appeal to the second level of review. (*Id.* at 2.) The second level response, dated December 16, 2014, states that the CDCR received the appeal on November 14, 2014. (*Id.* at 99.) The second level decision stated that Plaintiff had received a second opinion as requested in his first level appeal, as he was examined by a UCSF corneal specialist on December 15, 2014, specifically by Jennifer Ruth Rose-Nussbaumer, M.D., and Shilpa Joshi Desai, M.D. (*Id.*; *id.* at 15-18.) The second level decision concluded that Plaintiff's issue was "clearly addressed" and "[his] appeal is granted." (*Id.* at 99.)

The second level decision also summarized Plaintiff's appeal as follows:

> Appellant is appreciative of the partial granting of this appeal, however, dissatisfaction with First Level Response is based upon the fact that the mentioning of acute glaucoma has been mentioned for the first time and if Appellant had any symptoms of acute glaucoma he should have been treated for acute glaucoma and not for an eye surgery that had nothing to do with glaucoma. Again, Appellant request [*sic*] a second opinion and a decision from Second Level in order to exhaust his administrative remedies for purpose of seeking federal redress.

(*Id.* at 99.) The second review decision noted that Plaintiff raised the issue of mistreatment for glaucoma for the first time at the second level appeal and advised Plaintiff as follows:

> Please be advised that your additional comment regarding treatment of glaucoma is a new issue. The appeal process does not allow you to add to the "Action Requested" in the appeal. Therefore, any additional actions requested or mentioned cannot be considered at this time.

(*Id.* at 90.)

Based on the second level appeal decision, Defendant asserts that Plaintiff was advised that any new claim for damages due to the alleged failure to properly diagnose his glaucoma was not part of his administrative appeal. (Mot. at 10.) Plaintiff nevertheless pursued the matter to the third and final level of review at the Director's Level. (Compl. at 2.) The Director's level decision, dated March 11, 2015, stated that the appeal was denied with respect to Plaintiff's request that "a different doctor be appointed/assigned for a second opinion regarding the damage, pain and suffering you are suffering." (*Id.* at 100.) The Director's level decision noted that Plaintiff was examined at UCSF on February 11, 2015, and was to be "scheduled soon for the repair of the intraocular lens in [his] right eye." (*Id.*) The decision concluded that no intervention was necessary "as your medical condition has been evaluated and you are receiving treatment deemed medically necessary." (*Id.* at 101.) Based on the foregoing, Defendant asserts that Plaintiff did not exhaust his claim for damages based on Defendant's alleged failure to diagnose and properly treat his glaucoma in appeal No. SQ-HC-14039581. (Mot. at 11.)

In opposition, Plaintiff asserts that his appeal fully informed the Defendant of the allegations raised in this action concerning the two cataract surgeries and developing

13

glaucoma afterward.  (Opp. at 11-12.)  In support, Plaintiff attaches a copy of an inmate

appeal, No. SQ-HC-17041685, which he filed on March 24, 2017, specifically requesting

monetary damages from Defendant Sadeghi for the alleged deliberate indifference that

resulted in 90% blindness.  (*Id.*, Ex. C at 11.)  In reply, Defendant points out that that this

new appeal was not exhausted until November 2, 2017, well after Plaintiff filed the instant

action on April 17, 2017.  (*Id.*)

Viewing the undisputed evidence in the light most favorable to Plaintiff, the Court

finds that Plaintiff failed to properly exhaust his administrative remedies with respect to

his claim for damages against Defendant based on the alleged misdiagnosis and treatment

of his glaucoma.  *See Albino*, 747 F.3d at 1166.  At a minimum, Plaintiff is required "to

describe the problem and action requested."  Cal. Code Regs. tit. 15 § 3084.2(a)).  The

record shows that the inmate appeal on which Plaintiff based this action did not involve the

specific claim for damages regarding the failure to treat his glaucoma by Defendant.

(Compl. at 2.)  Inmate appeal No. SQ-HC-14039581 involved the claim for "pain and

suffering in right eye from medical malpractice and deprivation of medication" following

surgery performed on May 21, 2014.  (*Id.* at 94.)  There is no mention of glaucoma or any

claim regarding misdiagnosis nor any request for damages.  (*Id.*)  Accordingly, appeal No.

SQ-HC-14039581 did not exhaust administrative remedies with respect to the claim that

Defendant failed to diagnose and treat his glaucoma and request for damages raised in this

action.  Furthermore, Defendant is correct that inmate appeal No. SQ-HC-17041685,

submitted on March 24, 2017, does not constitute proper exhaustion because it was not

exhausted until November 2, 2017, well after Plaintiff had filed the instant action.  *See*

*supra* at 13.  As such, dismissal is warranted because Plaintiff must exhaust available

administrative remedies *before* he files suit, even if he fully exhausts while the suit is

pending.  *See McKinney*, 311 F.3d at 1199.

Based on the foregoing, Defendant has shown that Plaintiff failed to properly

exhaust all available administrative remedies with respect to his claim against Defendant

Sadeghi.  Plaintiff fails to show in opposition that there was something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him or that he was incapable of filing a timely appeal.  *Albino*, 747 F.3d at 1172; *Marella*, 568 F.3d at 1028.  Accordingly, Defendant is entitled to summary judgment under Rule 56 based on Plaintiff's failure to exhaust administrative remedies.  *Id.* at 1166.

Normally, Plaintiff would be entitled to file a new action based on the more recent exhaustion of this claim under appeal No. SQ-HC-17041685.  However, filing a new action would be futile because the Court finds the claim has no merit as discussed below.

## B.    <u>Deliberate Indifference</u>

Defendant also argues that he is entitled to summary judgment because there is no disputed material fact that he acted with deliberate indifference.  (Mot. at 12-13.)

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  *Id*.  The following are examples of indications that a prisoner has a "serious" need for medical treatment: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.  *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

A prison official is deliberately indifferent if he knows that a prisoner faces a

substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference. *Id*. If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

The evidence presented does not show a genuine dispute as to any material fact relating to Plaintiff's claim of deliberate indifference against Defendant Sadeghi. Assuming Plaintiff's medical condition was "serious," he fails to satisfy the second prong, *i.e.*, that Defendant was subjectively, deliberately indifferent to Plaintiff's medical needs because he failed to take reasonable steps to abate a substantial risk of serious harm. *See Farmer*, 511 U.S. at 834, 837. As Defendant points out, the undisputed evidence shows that from the day after Plaintiff's surgery on May 7, 2014, through March 17, 2016, Defendant examined Plaintiff at least 21 times. (Mot. at 7); *see supra* at 2-7. Plaintiff identifies two additional examinations not mentioned by Defendant: on May 12, 2014, when he passed out and was treated by Defendant in the infirmary, and on May 29, 2014, when he was summoned by Defendant for an examination. *Id.*; (Hearn Decl. ¶¶ 4, 8). During neither of these accounts did Defendant fail to take reasonable steps to abate a substantial risk of serious harm to Plaintiff. Then during the summer of 2014, Defendant Sadeghi examined Plaintiff on multiple occasions, during which time he noted that two small pieces of cortical material remained in Plaintiff's right eye and that he had developed inflammatory glaucoma, corneal inflammation and superficial punctate keratitis ("SPK"); Defendant treated these conditions with various medications applied through eye drops. *See supra* at 4-5. When Defendant observed for the first time in August 2014 that Plaintiff's lens implant was dislodged, he immediately referred Plaintiff to a corneal specialist at UCSF. *Id.* at 5. Although Plaintiff states in his declaration that Defendant mentioned he would refer Plaintiff to a cornea specialist as early as June 5, 2014, (Hearn

16

Decl. ¶ 9), the notes from that examination make no mention of such an intended referral and Plaintiff provides no other evidence to support this allegation.  (SQSP 2635.)  While the appointment with the USCF cornea specialist was pending, Defendant continued to monitor Plaintiff's condition.  *See supra* at 5.  After the examination by the cornea specialist in December 2014, Defendant monitored Plaintiff's condition during January and February 2015 until the surgery at UCSF to replace the dislocated right IOL took place in March 2015.  *Id.* at 6.  Thereafter, Defendant continued to monitor Plaintiff's condition during June and July 2015, until his second surgery at UCSF for a partial cornea transplant.  *Id.*  Defendant continued follow-up care when he examined Plaintiff in December 2015, and after finding that the IOP in his right eye was too high, again referred Plaintiff to UCSF for further evaluation.  *Id.* at 6-7.  That referral resulted in a glaucoma surgery later that month.  *Id.* at 7.  Following surgery, Defendant saw Plaintiff for several follow-up examinations in January 2016, during which he observed that the IOP had decreased and remained low, and during one appointment removed sutures.  *Id.*  Defendant last saw Plaintiff in March 2016 for a scheduled eight-week follow-up, which was otherwise unremarkable.  *Id.*  These extensive actions by Defendant Sadeghi over the course of nearly two years does not indicate deliberate indifference on his part to any medical need for Plaintiff's right eye.  Rather, the undisputed facts show that Defendant Sadeghi did not ignore Plaintiff's complaints but continuously provided medical care throughout this time and made prompt and appropriate referrals to specialists as required based on his observation and diagnosis of Plaintiff's developing condition, first for the lens implant replacement and then for glaucoma surgery.

With respect to the allegation that Defendant misdiagnosed Plaintiff for cataracts when he really had "acute glaucoma," even if this act of professional negligence were true, it does not state an Eighth Amendment claim.  *See McGuckin*, 974 F.2d at 1059.  Moreover, the evidence simply does not support this claim.  There is no evidence indicating that the initial cataract surgery performed by Defendant on May 7, 2014, was

1   unnecessary. Rather, the evidence shows that Plaintiff developed glaucoma *after* the

2   cataract surgery. *See supra* at 4. After Defendant Sadeghi noted that Plaintiff had

3   developed inflammatory glaucoma on June 6, 2104, he prescribed various medications to

4   treat it, including steroidal eye drops. *Id.* at 5. When Defendant next became aware that

5   Plaintiff's IOP was too high in early December 2015, he planned to refer Plaintiff to Dr.

6   Ross-Nussbaumer for further evaluation. *Id.* at 6-7. Within two weeks, Plaintiff received

7   an urgent request for services for glaucoma surgery and had the surgery soon thereafter.

8   *Id.* at 7. Defendant's actions in treating Plaintiff's glaucoma, which developed *after* the

9   cataract surgery, do not indicate any disregard of a serious harm to Plaintiff and a failure to

10  take reasonable steps to abate it.

11         In opposition, Plaintiff asserts for the first time that Defendant failed to properly

12  treat his glaucoma with Timpotic or Propine. (Opp. at 2, 9.) However, a "difference of

13  opinion between a prisoner-patient and prison medical authorities regarding treatment does

14  not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

15  Similarly, a showing of nothing more than a difference of medical opinion as to the need to

16  pursue one course of treatment over another is insufficient, as a matter of law, to establish

17  deliberate indifference. *See Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004);

18  *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). As such, even if Plaintiff were to

19  provide evidence of a differing medical opinion, which he does not, it would not be

20  sufficient to establish a § 1983 claim against Defendant. *Id.* Moreover, as Defendant

21  argues in reply, Plaintiff submits no evidence indicating that Defendant consciously chose

22  not to prescribe these specific medications knowing his decision would cause an excessive

23  risk of harm to Plaintiff. (Reply at 3.) Rather, the evidence shows that Defendant

24  immediately began treating the glaucoma at the first signs of inflammation by prescribing

25  medication that he believed was medically appropriate. *See supra* at 5.

26         Even if the Court construes the facts in the light most favorable to Plaintiff and

27  assumes as true Defendant's alleged statement on May 15, 2014, that "he had made a

28

mistake and left a piece of cataract in his right eye," (Hearn Decl. ¶ 5), this statement does not establish deliberate indifference.  While it may be a basis to establish a claim for negligence or medical malpractice, neither of these claims are sufficient to make out a violation of the Eighth Amendment.  *See Toguchi*, 391 F.3d at 1060; *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002); *Franklin*, 662 F.2d at 1344; *see, e.g.*, *McGuckin*, 974 F.2d at 1059 (mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's 8th Amendment rights).  Furthermore, Plaintiff does not dispute that within a week after this alleged statement, Defendant performed an operation to aspirate the remaining cortical material from Plaintiff's eye.  *See supra* at 3.  Accordingly, it cannot be said that Defendant knew that Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable steps to abate it.  *See Farmer*, 511 U.S. at 837.  Rather, Defendant took prompt action once he became aware of the condition and performed additional surgery.

Based on the evidence presented, Defendant has shown that there is no genuine issue of material fact with respect to Plaintiff's deliberate indifference claim.  *See Celotex Corp.*, 477 U.S. at 323.  In response, Plaintiff has failed to point to specific facts showing that there is a genuine issue for trial, *id.* at 324, or identify with reasonable particularity the evidence that precludes summary judgment, *Keenan*, 91 F.3d at 1279.  Accordingly, Defendant is entitled to judgment as a matter of law.  *Id.*; *Celotex Corp.*, 477 U.S. at 323.

## CONCLUSION

For the reasons stated above, Defendant Dr. Jahangir Sadeghi's motion for summary judgment is **GRANTED**.  (Docket No. 19.)  The Eighth Amendment claim against him is **DISMISSED** for failure to exhaust administrative remedies, *see Vaden*, 449 F.3d at 1051, and **DISMISSED with prejudice** on the merits.[4]  *See Celotex Corp.*, 477

---

[4] Because the Court finds that no constitutional violation occurred, it is not necessary to reach Defendant's qualified immunity argument.

19

U.S. at 323.

This order terminates Docket No. 19.

**IT IS SO ORDERED.**

**Dated:**  January 9, 2019

BETH LABSON FREEMAN
United States District Judge